# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO ANTONIO BALLARD,<br><br>                                        Petitioner,<br><br>vs.<br><br>MATTHEW CATE, et al.,<br><br>                                        Respondents. | Civil No.          09cv0957-IEG (CAB)<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**(1) DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS; and**<br><br>**(2) DENIAL OF REQUEST FOR EVIDENTIARY HEARING** |

## I.      INTRODUCTION

Roberto Antonio Ballard, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus ("Pet.") pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court conviction in case number SCE247764 for one count of assault on a child with force likely to produce great bodily injury resulting in death and one count of involuntary manslaughter. (Lodgment No. 1, vol. 2 at 0284-85.) Ballard claims his federal constitutional rights were violated for the following reasons: (1) the jury was not properly instructed on all elements of the crimes; (2) his right to a speedy trial was violated; (3) his due process rights to a fair trail were violated when he was shackled during the trial; and (4) his right to a fair trial was violated when the state court ignored exculpatory evidence. (Pet. at 6-9; Mem. P. & A. Supp. Pet. at 10-21.) Ballard also asks for an evidentiary hearing on claim four. (Mem. P. & A. Supp. Pet. at 21.) Respondent contends the claims are procedurally defaulted, and, in any event, fail on the merits. (Answer at 2-6; Mem. P. & A. Supp. Answer at 1-19.)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of the Answer, the Lodgments submitted by Respondent, Petitioners' Traverse, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition and the request for an evidentiary hearing be **DENIED**.

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct. Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C.A. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992)(holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The facts as found by the state appellate court are as follows[1]:

A. The People's Case

Ballard lived with his girlfriend, Isabel De Leon (Isabel); [footnote 3] Isabel's 16-year-old brother, Jose De Leon (Jose); and Isabel's three children, Cesar, Estella, and Angel, who was 16 months old.

FN3. The use of first names is solely for purposes of clarity.

In the morning on the day Angel died, Isabel did not notice any bruises on Angel's body when she gave him a bath. Isabel went to work and left her children with Ballard and Jose. Jose testified that Ballard was inside with the three children while Jose was cutting the grass in front of their home. Cesar testified that he woke to sounds indicating someone was being hit, Angel was crying, and Ballard was speaking in an angry tone. From his position outside, Jose observed Ballard leave the home.

Ballard took Angel to the hospital and identified himself to staff as the father. Ballard told Dr. Herrera, a pediatric resident, that Angel had fallen off the kitchen table, and Ballard decided to bring him to the hospital. Isabel testified that Ballard called her at work, he sounded desperate, and he wanted to know Angel's birthday and medical history. Ballard again telephoned Isabel and told her to come to the hospital because Angel was there. When Isabel arrived at the hospital she found Angel in the ICU, and Ballard was not in the hospital. Angel was brain dead and later died of blunt force head injuries.

Dr. Christina Stanley, the chief deputy medical examiner for the County of San Diego, performed Angel's autopsy. Dr. Stanley noted that Angel had numerous bruises and abrasions on his head, forehead, ear, cheek, arm, back, abdomen, thigh, knee, and shin. Angel also had a complex skull fracture and a broken humerus bone. Dr. Stanley identified multiple areas of force impact on Angel's head, back, abdomen, knees and lower legs. She believed that the injuries to Angel's face could have been caused by a

---

[1]  The Court of Appeal opinion, lodged as Lodgment No. 6, is missing pages 2 and 4.  Thus, the facts are taken from *People v. Ballard*, 2007 WL 1600386, slip op. (Cal. Ct. App. 2007) instead of Lodgment No. 6

1   person forcibly striking Angel with his hand and that the complex skull fracture was
2   inconsistent with a fall. Dr. Sandra Murray, a pediatrician with additional training in
    family violence, testified that the fracture in Angel's humerus bone and the bruising on
3   both sides of his face were inconsistent with a fall.

    B. The Defense Case
4
    Ballard did not present any evidence at trial.
5

6   (*People v. Ballard*, 2007 WL 1600386, slip op. (Cal. Ct. App. 2007) at *1.)

7   **III.      PROCEDURAL BACKGROUND**

8          On February 16, 2005, the San Diego County District Attorney's Office charged Roberto Antonio

9   Ballard with one count of assault on a child by means of force likely to produce great bodily injury

10  resulting in death, in violation of California Penal Code ("Penal Code") section 273ab, and one count

11  of murder, in violation of Penal Code section 187(a).  (Lodgment No. 1, vol. 1 at 0001-02.)  The

12  Information also alleged that Ballard had suffered a prior conviction for which he served a separate

13  prison term, within the meaning of Penal Code sections 667.5(b) and 668.  (*Id.*)

14         Following a jury trial, Ballard was convicted of the assault on a child charge and convicted of

15  the lesser included offense of involuntary manslaughter on the murder charge.  (*Id.* at 0284-85.)  Ballard

16  admitted suffering the prior conviction as alleged at a subsequent hearing.  (Lodgment No. 2, vol. 11 at

17  1501-06.)

18         Ballard appealed to the California Court of Appeal for the Fourth Appellate District, Division

19  One, which affirmed the conviction and sentence in an unpublished opinion filed June 5, 2007.

20  (Lodgment Nos. 3, 4, 5, 6.)  Ballard filed a Petition for Review in the California Supreme Court, which

21  that court denied without citation of authority on August 8, 2007.  (Lodgment Nos. 7, 8.)

22         Thereafter, Ballard filed a petition for writ of habeas corpus in the San Diego Superior Court.

23  (Lodgment No. 9.)  That court denied the petition in a written, unpublished opinion on December 6,

24  2007.  (Lodgment No. 10.)  Ballard then filed a petition for writ of habeas corpus in the California Court

25  of Appeal for the Fourth Appellate District, Division One, which denied the petition in a written,

26  unpublished opinion filed on May 9, 2008.  (Lodgment Nos. 11, 12.)  Finally, Ballard filed a petition for

27  writ of habeas corpus in the California Supreme Court.  (Lodgment No. 13.)  The court denied the

28  petition on December 10, 2008, citing *In re Dixon*, 41 Cal. 2d 756 (1953).  (Lodgment No. 14.)

3

Ballard filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on May 4, 2009, with a Memorandum of Points and Authorities in Support of the Petition. (Doc. No. 1.) Respondent filed an Answer and Memorandum of Points and Authorities in Support of the Answer on September 10, 2009. (Doc. No. 11.) Ballard filed a Traverse on November 13, 2009. (Doc. No. 17.)

IV. **DISCUSSION**

A.  **Scope of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (West 2006) (emphasis added). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (West 2006) (emphasis added).

"[The Anti Terrorism and Effective Death Penalty Act] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F.3d 998, 1001 (9th Cir. 2007) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)). To obtain federal habeas relief, Ballard must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the

4

1    prisoner's case.

2  *Id.* at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

3    Where there is no reasoned decision from the state's highest court, the Court "looks through" to

4  the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the

5  dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must

6  conduct an independent review of the record to determine whether the state court's decision is contrary

7  to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223

8  F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes*

9  *v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  A state court, however, need not cite Supreme Court

10  precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as

11  neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]"

12  *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*

13    **B.    Analysis**

14    Ballard alleges four claims in his petition.  First, he claims the state court failed to instruct the

15  jury on all elements of the offense when it refused to define the term "conscious disregard for life" after

16  the jury sent a note out during deliberations asking for the term to be defined.  (Pet. at 6; Mem. of P. &

17  A. Supp. Pet at 10-11.)  Second, he argues there was sufficient delay in bringing him to trial such that

18  his federal due process right to a speedy trial was violated.  (Pet. at 7; Mem. of P. & A. Supp. Pet. at 15.)

19  Third, he claims that he was shackled in full view of the jury and without any judicial finding that such

20  shackling was necessary, in violation of his federal due process rights to a fair trial.  (Pet. at 8; Mem. of

21  P. & A. Supp. Pet at 16-20.)  Fourth, he argues that evidence establishing he is actually innocent of the

22  charges was withheld by the prosecutor.  He further claims the trial court judge refused to acknowledge

23  this and other evidence presented at trial establishes his innocence.  He also asks the Court to conduct

24  an evidentiary hearing on this claim.  (Pet. at 9; Mem. of P. & A. Supp. Pet. at 12-14, 16-27.)

25    Respondent contends claims one, two and four are procedurally defaulted because Ballard last

26  raised these claims in a habeas corpus petition he filed in the California Supreme Court.  That court

27  denied the claims citing *Dixon* which Respondent contends is an adequate and independent state

28  procedural bar.  (Answer at 6; Mem. P. & A. Supp. Answer at 1-5.)  Respondent also contends claim

three is procedurally barred because the state appellate court denied the claim on procedural grounds. (Answer at 6.)  In the alternative, Respondent argues the state court's adjudication of Ballard's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law and that he is not entitled to an evidentiary hearing on claim four.  (Mem. of P. & A. in Supp. of Answer at 5-26.)

### 1.   *Procedural Default*

Respondent contends claims one, two and four are procedurally defaulted because Ballard last raised them in the habeas corpus petition he filed in the California Supreme Court which denied them with a citation to *Dixon*.  (*See* Lodgment Nos. 13, 14.)  The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent must first have "adequately pled the existence of an independent and adequate state procedural ground . . . ."  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  In order to place the defense at issue, Ballard must then "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ."  *Id.*  The "ultimate burden" of proving procedural default, however, belongs to the state. *Id.*  If the state meets its burden under *Bennett*, federal review of the claim is foreclosed unless Ballard can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### a.   *Independence*

In 1998, the California Supreme Court declared that it would no longer consider federal law when denying a habeas claim as procedurally defaulted.  *In re Robbins*, 18 Cal. 4th at 770, 811-12 (1998).  Although the  Ninth Circuit has not specifically determined whether a post-*Robbins* application of the *Dixon* rule is independent of federal law, the Ninth Circuit has generally stated, "[t]he California Supreme Court has adopted in *Robbins* a stance from which it will now decline to consider federal law when deciding whether claims are procedurally defaulted." *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000).  Moreover, although *Bennett* concerned only California's untimeliness bar as stated in *In re Clark*, 5 Cal. 4th 750 (1993), the analysis in that case compels the same result for claims barred pursuant to the rule established by *Dixon*.  The pre-*Robbins* application of the two procedural bars was similar

1    in that the invocation of either *Dixon* or *Clark* required the state court to determine if there existed

2    fundamental constitutional error that would excuse the petitioner's default, and such an analysis

3    necessarily involved the consideration of federal law.  *Bennett*, 322 F.3d at 581-82; *see also LaCrosse*

4    *v. Kernan*, 244 F.3d 702, 707 (9th Cir. 2001) (observing that consideration of federal law in barring

5    claims as pretermitted is "analogous" to consideration of federal law in barring claims as untimely).

6    Furthermore, in *Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1007-08 (S.D. Cal. 2004), the court found a

7    post-*Robbins* application of *Dixon* to be independent of federal law, and this Court agrees with that

8    conclusion.  The California Supreme Court denied Ballard's habeas corpus petition with a citation to

9    *Dixon* on December 10, 2008, well after the decision in *Robbins*.  Accordingly, Respondent has met his

10   initial burden under *Bennett* to establish that *Dixon* is an independent state procedural bar.  *Bennett*, 322

11   F.3d at 586.  Moreover, because Ballard only challenges the adequacy of *Dixon* in his Traverse, the court

12   also concludes Respondent has met his ultimate burden under *Bennett* with regard to independence as

13   well.  *Id.*

14            b.    *Adequacy*

15            The analysis with regard to adequacy is more complex.  Citing *Bennett*, Respondent contends

16   that "Ballard has not demonstrated the inadequacy of the state proceedings which barred his habeas

17   petitions for failure to assert the claim on direct appeal."  (Mem. P. & A. Supp. Answer at 4.)  This

18   satisfies Respondent's initial burden under *Bennett*.  322 F.3d at 586.  Ballard must therefore satisfy his

19   "modest" interim burden by asserting the inadequacy of *Dixon* with particularity.  *Bennett*, 322 F.3d at

20   586.  In his traverse, Ballard contends the *Dixon* rule has not been consistently applied and cites *Dennis*

21   *v. Brown*, 361 F. Supp. 2d 1124 (N.D. Cal. 2005), *Carpenter v. Ayers*, 548 F. Supp. 2d 736 (N.D. Cal.

22   2008) and *In re Crocket*, 159 Cal. App. 4th 751 (2008) as support for this contention.  (Traverse at 9-10.)

23   *Dennis* and *Carpenter* are capital cases which conclude *Dixon* was not consistently applied between

24   1993 and 2003.  *See Dennis*, 361 F. Supp. 2d at 1130-31.  The relevant time for the purported default

25   in Ballard's case was 2006, when he filed his direct appeal.  *See Fields v. Calderon*, 125 Fl.3d 757, 760-

26   61 (9th Cir. 1997).

27            The Court need not decide whether Ballard's efforts satisfy his interim burden, however, because

28   the Ninth Circuit has stated that where deciding the merits of a claim proves to be less complicated and

less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claims on their merits and forgo an analysis of cause and prejudice. *See Boyd v. Thompson,* 147 F.3d 1124, 1127 (9th Cir. 1998). Accordingly, the Court will address the merits of Ballard's claims. Because the state supreme court denied these claims on procedural grounds and did not issue a reasoned opinion on the claim, this Court must conduct a *de novo* review of this claim. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

### 2. *Instructional Error (Claim One)*

In claim one, Ballard alleges the jury was not properly instructed because when it asked for a definition of the term "conscious disregard for human life," the trial judge did not provide a definition but simply told the jury to "use the everyday meaning" of the words. (Pet'rs Mem. P. & A. Supp. Pet. at 11-12; Lodgment No. 1, vol. 2 at 0194-95.) Ballard's jury was instructed on the crimes of second degree murder, which requires a finding of conscious disregard for human life, and involuntary manslaughter, which does not. (Lodgment No. 1, vol. 2 at 0178-79, 0188-89.) They were also instructed on the crime of assault on a child resulting in death, which requires the jury to find that the defendant willfully did an act, the natural and probable consequences of which were the death of a child. (*Id.* at 0181-82.) The jury ultimately convicted Ballard of involuntary manslaughter and assault on a child resulting in death. (*Id.* at 0284-85.) Ballard argues the intent element of assault on a child resulting in death, a willful act, the natural and probable consequences of which are the death of a child, and second degree murder, conscious disregard for human life, are so similar that the jury would also have acquitted him of the assault on a child charge if they had been given the proper definition of "conscious disregard for human life." (Mem. P. & A. Supp. Pet. at 11-12.)

Respondent counters that the trial judge had no obligation to provide any definition of "conscious disregard for human life" because the California jury instructions used in this case do not provide any such definition. (Mem. P. & A. Supp. Answer at 9.) Even if such a definition existed, Respondent contends, Ballard would not be entitled to relief because there is no United States Supreme Court authority which requires a state court to instruct on anything other than the elements of the offense. (*Id.*)

An instructional error can form the basis for federal habeas corpus relief if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'

1  [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v.*

2  *Naughten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The allegedly

3  erroneous jury instruction cannot be judged in isolation, however.  *Estelle v. McGuire*, 502 U.S. 62, 72

4  (1991).  Rather, it must be considered in the context of the entire trial record and the instructions as a

5  whole.  *Id.*

6         In California, "[s]econd degree murder is the unlawful killing of a human being with malice, but

7  without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support

8  a conviction of first degree murder." *People v. Sarun Chun*, 45 Cal. 4th 1172, 1181 (2009) (internal

9  citations omitted).  Malice may be express or implied.  *Id.*  Ballard was prosecuted on a theory of implied

10  malice.  The California Supreme Court has explained the definition of implied malice as follows:

11         We have interpreted implied malice as having "both a physical and a mental component.
       The physical component is satisfied by the performance of 'an act, the natural
12       consequences of which are dangerous to life.' (*People v. Watson* (1981) 30 Cal.3d 290,
       300[, 179 Cal.Rptr. 43, 637 P.2d 279].)  The mental component is the requirement that
13       the defendant 'knows that his conduct endangers the life of another and ... acts with a
       conscious disregard for life.' (*Ibid.*, internal quotation marks omitted.)" (*People v.*
14       *Patterson* (1989) 49 Cal.3d 615, 626, 262 Cal.Rptr. 195, 778 P.2d 549 (lead opn. of
       Kennard, J.) ( *Patterson* ).)

15

16  *Sarun Chan*, 45 Cal. 4th at 1181.

17         With regard to this charge, the jury in Ballard's case was instructed with Judicial Council of

18  California Criminal Jury Instructions (CALCRIM), the criminal jury instructions which were approved

19  as the official jury instructions in California in 2005, and not California Jury Instructions, Criminal

20  (CALJIC) which were previously in use.  CALCRIM defines second degree murder as follows:

21         To prove that the defendant is guilty of [second degree murder], the People must
       prove that:
22
          1. The defendant committed an act that caused the death of another person; AND
23
          2. When the defendant acted, he had a state of mind called malice
24       aforethought; AND

25          3. He killed without lawful excuse or justification.

26         There are two kinds of malice aforethought, express malice and implied malice.
       Proof of either is sufficient to establish the state of mind required for murder.
27
          The defendant acted with express malice if he unlawfully intended to kill.
28
          The defendant acted with implied malice if:

9

1                         1.  He intentionally committed an act;

2                         2.  The natural and probable consequences of the act were dangerous to human life; AND

3

4                         3.  At the time he acted, he knew his act was dangerous to human life; AND

5                         4.  He deliberated acted with conscious disregard for human life.

6               Malice aforethought does not required hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does

7  not require deliberation or the passage of any particular period of time.

8               An act causes death if the death is the direct, natural an probable consequence of the act and the death would not have happened without the act.  A *natural and probable*

9  *consequence* is one that a reasonable person would know is likely to happen if noting unusual intervenes.  In deciding whether a consequence is natural and probable, consider

10  all the circumstances established by the evidence.

11              There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A *substantial factor* is more than a trivial or

12  remote factor.  However, it does not need to be the only factor that causes the death.

13  (Lodgment No. 1, vol. 2 at 0187-88.)

14       The elements of the crime of assault on a child resulting in death, are: "(1) A person, having the

15  care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a

16  reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death.

17  */ / /*

18  *People v. Malfavon*, 102 Cal. App. 4th 727, 735 (2002) (internal citations omitted.)  The jury was also

19  properly instructed with regard to this crime, pursuant to CALCRIM No. 820:

20      To prove that the defendant is guilty of this crime, the People must prove that:

21      1.  The defendant had care or custody of a child who was under the age of 8;

22      2.  The defendant did an act that by its nature would directly and probably result in the application of force to the child;

23

24      3.  The defendant did that act willfully;

25      4.  The force used was likely to produce great bodily injury;

26      5.  When the defendant acted, he was aware of the facts that would lead a reasonable person to realize that he act by its nature would directly and probably result in great bodily injury to the child;

27

28      6.  When the defendant acted, he had the present ability to apply force likely to produce great bodily injury to the child; AND

7.  The defendant's act caused the child's death.

Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else or gain any advantage.

*Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.

An act *causes death* if:

1. The death was the natural and probable consequence of the act;

2. The act was a direct and substantial factor in causing the death; AND

3. The death would not have happened without the act.

A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

A *substantial factor* is more than a trivial or remote factor.

However, it does not need to be the only factor that caused the death.

(Lodgment No. 1, vol. 2 at 0181-82; CALCRIM No. 820.)

Ballard contends that trial judge should have provided the jury with the definition of "conscious disregard for human life" contained in the CALJIC instructions when they sent their note asking for clarification of the phrase.  (Mem. of P. & A. Supp. Pet. at 11-12.)  He argues the verdicts are inconsistent because the jury acquitted him of second degree murder, which required them to conclude he did not act with implied malice, but convicted him of assault on a child causing death, which he claims has an equivalent mental state.  (*Id.*)  Had they been given the CALJIC definition, he claims the jury would not have convicted him of the assault on a child charge.  (*Id.*)

The Court first observes that the instructions given to the jury on the murder and assault on a child causing death charge contain no errors.  They accurately define the crimes and their elements under California law.  This alone defeats Ballard's claim of instructional error.  *See Estelle*, 502 U.S. at 72.

Further, while the metal states of the two crimes are similar, they are not the same.  For second degree murder, implied malice requires a defendant to act with "conscious disregard for human life" and that the natural consequences of the act to be "dangerous to life."  The crime of assault on a child causing death requires the defendant to act willfully and be aware that the natural and probable consequences

of the act to be "great bodily injury to the child," but does not explicitly require a finding of "conscious disregard for human life." (CALJIC No. 8.40; Lodgment No. 1, vol. 2 at 0181-82 (CALCRIM No. 820.) Moreover, CALJIC's definition of "conscious disregard for life," is "a killing [that] results from the doing of an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his or her conduct endangers the life of another and who acts with conscious disregard for life." (CALJIC No. 8.40; *see also People v. Lima*, 118 Cal. App. 4th 259, 265 (2004) (stating that "[a]ny act that is ' "fraught with grave and inherent danger to human life'" is sufficient to establish that the defendant acted with conscious disregard for human life). There is no likelihood that the jury would have failed to convict Ballard of the assault on a child charge based on the definition of an element of the second degree murder charge. *See Estelle*, 502 U.S. at 72. Thus, even if there was instructional error, it did not "'so infect[] the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw*, 255 F.3d at 971.

For the foregoing reasons, the Court concludes Ballard's due process right were not violated by the state court's decision not to define the term "conscious disregard for human life." He is not entitled to relief as to this claim.

> 3.    *Speedy Trial (Claim Two)*

Ballard argues in claim two that his right to a speedy trial was violated by repeated delays in his trial date. He also claims this violated his federal equal protection rights. (Pet. at 7; Mem. of P. & A. Supp. Pet. at 15.) Respondent counters that Ballard has not established any violation of his rights under the applicable federal law. (Mem. of P. & A. Supp. Answer at 9-12.)

"The Sixth Amendment guarantees that in all criminal prosecutions the accused shall enjoy the right to a speedy trial." *Doggett v. United States*, 505 U.S. 647, 651 (1992); *United States v. Beamon*, 992 F.2d 1009, 1012 (9th Cir. 1993). The Court must assess four factors in determining whether the right to a speedy trial has been violated:  1) the length of the delay; 2) the reason for the delay; 3) whether the defendant asserted the right; and 4) whether the defendant suffered prejudice as a result of the delay. *Doggett*, 505 U.S. at 651; *Barker v. Wingo*, 407 U.S. 514, 530 (1972). To trigger a speedy trial inquiry, the petitioner must show that the period between indictment and trial passes a threshold point of "presumptively prejudicial" delay. *Beamon*, 992 F.2d at 1012. Generally, a delay of about one

1  year has been found to be "presumptively prejudicial." *Id*. at 1012-13.  Only if this threshold is met,

2  does a court proceed to the analyze the rest of the *Barker* factors.  *Beamon*, 992 F.2d at 1012.  Ballard

3  meets the threshold test, as the delay between the filing of charges, which occurred on February 16,

4  2005, and the beginning of his trial, which occurred on April 6, 2006, was approximately fourteen

5  months.  (Lodgment No. 1, vol. 1 at 0001-03; Lodgment No. 2, vol. 1.)  The Court must therefore

6  "consider[] the extent to which the delay exceeds the threshold point in light of the degree of diligence

7  by the government and acquiescence by the defendant to determine whether sufficient prejudice exists

8  to warrant relief."  *Beamon*, 992 F.2d at 1012, citing *Doggett*, 505 U.S. at 651.

9       The delay in Ballard's case was due in large part to requests by defense counsel and in each

10  instance, Ballard agreed to the continuance.  Ballard's first court appearance was on February 16, 2005.

11  (Lodgment No. 1, vol. 2 at 0244.)  His arraignment was continued to March 2, 2005.  Ballard agreed to

12  this delay by waiving his state speedy trial rights.  (*Id.*)  On March 2, 2005, Ballard was arraigned; a

13  readiness conference date of March 24, 2005 and a preliminary hearing date of March 30, 2005 were set.

14  (*Id.* at 0245.)  On March 24, 2005, the defense moved for a continuance.  Ballard again agreed to the

15  continuance by waiving his statutory time limits and the preliminary hearing was rescheduled for June

16  1, 2005.  (*Id.* at 0246.)  On June 1, 2005, the defense was granted another continuance, Ballard again

17  waived time and the preliminary hearing was rescheduled for July 12, 2005.  (*Id.* at 0247.)

18       The preliminary hearing took place on July 12, 2005 and Ballard was held to answer.  A

19  readiness conference date was set for September 13, 2005 and a trial date was set for October 11, 2005.

20  (*Id.* at 0249.)  At the September 13 court appearance, the matter was continued for a further readiness

21  conference to November 14, 2005  the trial date was re-set for January 9, 2006.  Ballard agreed to this

22  delay by waiving his statutory speedy trial rights.  (*Id.*  at 0251.)  The court was advised on November

23  14, 2005 that new counsel had been assigned to Ballard and that the readiness conference and the trial

24  date would have to be moved.  The readiness conference was re-set for December 5, 2005; the readiness

25  date was further continued to December 12, 2005 when Ballard's counsel was unavailable that day.  (*Id.*

26  at 0253-54.)  At the December 12, 2005 court date, the jury trial was re-set for March 20, 2006 and

27  Ballard again waived time.  (*Id.* at 0255.)  The trial date was re-set on March 10, 2006 for April 5, 2006,

28  to which Ballard agreed.  (*Id.* at 0257.)  On April 5, 2006, the trial was re-set for the following day and

1  trial began on that day, April 6, 2006.  (*Id.* at 0259.)

2       The record plainly indicates Ballard agreed to the vast majority of delays in his case.  "Failure

3  to assert the [speedy trial] right will make it difficult for a defendant to prove that he was denied a

4  speedy trial."  *Barker*, 407 U.S. at 532; *see United States v. Sears Roebuck*, 877 F.2d 734, 740 (9th Cir.

5  1989) (stating that "failure to assert [the] right to a speedy trial in a timely fashion . . . weighs heavily

6  against dismissal"); *United States v. Simmons*, 536 F.2d 827, 831 (9th Cir. 1976) (holding that "failure

7  to demand a speedy trial will make it difficult for [defendant] to prove that there was an abridgement

8  of this guarantee").

9       Finally, Ballard has shown no prejudice.  Prejudice to a defendant must be viewed in light of the

10  which the speedy trial was designed to protect.  "The [Supreme] Court has identified three such interests:

11  (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and

12  (3) to limit the possibility that the defense will be impaired."  *Barker*, 407 U.S. 532.  Ballard simply

13  states that the delay in bringing him to trial was without a "valid waiver" and that the delay prejudiced

14  him.  (Mem. of P. & A. Supp. Pet. at 15.)  There has been no showing that Ballard's pretrial

15  incarceration was oppressive or that they delay resulted in any more "anxiety and concern" than a

16  defendant would normally have experienced.  Most importantly, Ballard has not provided any evidence

17  that his defense was impaired in any way.  For the foregoing reasons, the Court concludes Ballard's

18  federal speedy trial rights were not violated by the delay between his arrest and trial.  He is not entitled

19  to relief as to this claim.

20       Ballard's equal protection claim is equally without merit.  The Supreme Court has outlined the

21  appropriate analysis for an equal protection claim:

22      The Equal Protection Clause of the Fourteenth Amendment commands that no State shall
       deny to any person within its jurisdiction the equal protection of the laws, which is
23      essentially a direction that all persons similarly situated should be treated alike.  *Plyler*
       *v. Doe*, 457 U.S. 202, 216 (1982). . . .The general rule is that legislation is presumed to
24      be valid and will be sustained if the classification drawn by the statute is rationally
       related to a legitimate state interest. [citations omitted]. . . .The general rule gives way,
25      however, when a statute classifies by race, alienage, or national origin.  These factors are
       so seldom relevant to the achievement of any legitimate state interest that laws grounded
26      in such considerations are deemed to reflect prejudice and antipathy — a view that those
       in the burdened class are not as worthy or deserving as others.  For these reasons and
27      because such discrimination is unlikely to be soon rectified by legislative means, these
       laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored
28      to serve a compelling state interest. [citations omitted].

14

1   *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).

2       Ballard has not established how he was treated differently from similarly situated individuals.

3   Because he provides no factual basis for this claim, he is not entitled to relief.  *See James v. Borg*, 24

4   F.3d 20, 26 (9th Cir. 1994) (stating that "[c]onclusory allegations which are not supported by a statement

5   of specific facts do not warrant habeas relief").

6           4.      *Actual Innocence/Exculpatory Evidence (Claim Four)*

7       Ballard alleges in claim four that information disclosed during trial and at his sentencing hearing

8   was withheld from defense counsel in violation of his federal due process rights as delineated in *Brady*

9   *v. Maryland*, 373 U.S. 83 (1963).  Specifically, Ballard claims the prosecutor withheld information that

10  the victim, Angel, had a fever and had been throwing up blood about three days before his death.  Jose

11  de Leon, Angel's uncle, testified to this at trial.  (Pet. at 9; Mem. of P. & A. Supp. Pet 12-14; Mem. of

12  P. & A. Supp. Reply at 13-20.)  Ballard also claims testimony at his sentencing hearing by the court-

13  appointed advocate for the victim's brother and sister that through therapy it had been discovered the

14  victim's sister, Estella, witnessed the murder, deprived him of a percipient and possibly exculpatory

15  witness.[2]  These two pieces of information, he claims, cast doubt on the validity of his conviction.  He

16  also asks for an evidentiary hearing on this claim.  (Mem. of P. & A. Supp. Pet. at 1, 21.)  Respondent

17  counters that there was no *Brady* violation because the prosecutor did not suppress the information and

18  that there was sufficient evidence presented at trail to establish his guilt.  (Mem. of P. & A. Supp.

19  Answer at 15-19.)

20          a.      *Evidentiary Hearing*

21      Evidentiary hearings in 28 U.S.C. § 2254 cases are governed by the AEDPA, which

22  "substantially restricts the district court's discretion to grant an evidentiary hearing."  *Baja v. Ducharme*,

23  187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

24              (2) If the applicant has failed to develop the factual basis of a claim in State court
            proceedings, the court shall not hold an evidentiary hearing on the claim unless the
25          applicant shows that –

26  _____

27          [2] In his petition, Ballard also alleges that "during weekly psycho-therapy sessions it has been determined
    that 10-year-old Cesar Solar is the perpetrator of the crime of which petitioner is convicted." (Pet. at 6.)  This
28  simply misstates the record.  The court-appointed advocate testified that "It's been determined that the 10-year-
    old without really extensive therapy *could grow up to be a perpetrator himself*." (Lodgment No. 2, vol. 11 at
    1538.)

(A) the claim relies on –

    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The Ninth Circuit has outlined the procedure for district courts to follow in determining whether to grant a request for an evidentiary hearing.  First, the Court must "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078).  If not, the Court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.*  A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.  If the petitioner has failed to develop the factual basis for his claim in state court, "the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)." *Insyxiengmay*, 403 F.3d at 669-70.

If, however, the petitioner "has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under *Townsend [v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)]." *Id.*  *Townsend* identified six situations in which a habeas petitioner would be entitled to an evidentiary hearing:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 372 U.S. at 313.

09cv0957

Thus, if a petitioner has not failed to develop the factual basis for his claim, he is entitled to an evidentiary hearing in federal court if he meets one of the *Townsend* factors and makes allegations which, if true, would entitle him to relief.  *See Insyxiengmay*, 403 F.3d at 670; *see also Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003).

In the present case, a sufficient factual basis exists in the record to decide the claim.  The trial transcripts and other records in this case provide enough information for the Court to resolve the merits of Ballard's claim.  *See Insyxiengmay*, 403 F.3d at 669-70.  Even if this were not so, Petitioner would not be entitled to an evidentiary hearing because he "failed to develop" his claim in state court.  He did not request an evidentiary hearing on this claim in the habeas corpus petition he filed in the California Supreme Court.  (*See* Lodgment Nos. 11, 13.)  Accordingly, the Court recommends that Petitioner's request for an evidentiary hearing on his Brady claim be **DENIED**.

b. *Merits*

The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) that due process requires a prosecutor to disclose all material evidence, including impeachment evidence, to the defendant.  *Brady*, 373 U.S. at 87;  *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985).  In order to establish a *Brady* violation, Petitioner must show (1) the evidence was suppressed by the prosecution, either willfully or inadvertently; (2) the withheld evidence was exculpatory or impeachment material; and (3) he was prejudiced by the failure to disclose.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing *Bagley*, 473 U.S. at 676, 678 and *United States v. Agurs*, 427 U.S. 97, 110 (1976).)  "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial."  *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at 111-12).  "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases."  *Id.* (citing *Bagley*, 473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986.)

Ballard has not established any of the elements of a successful *Brady* claim.  First, there is no evidence the prosecution suppressed the information about Angel allegedly throwing up blood or Estrella witnessing Angel's death.  As to the information about the victim throwing up blood in the days before his death, it is clear from the record that de Leon claimed this for the first time at trial:

1     [DEFENSE COUNSEL GREENSPAN].  How was he doing for those three days?

2     [DE LEON]. Uh, well, before I think — I think my sister told me that he was throwing up blood or and he was throwing up.

3

4     Q. Throwing up blood?

5     A. Yes.

6     Q. When did she telling [sic] you that?

7     A. Huh?

8     Q. When did she tell you that?

9     A. When I was home.  I was home and she told me.

10    Q. I know.  I know.  But when was this that he was throwing up blood, that day, that morning before?

11    A. Oh, no, that was probably two days before.

12    Q. Two days before your sister told you that he was throwing up blood?

13    A. Yes.

14    Q. You didn't tell the police that, did you?

15    A. I just said he was throwing up.

16    Q. Why didn't you tell them he was throwing up blood?

17    MR. MECHALS: Objection.  Misstates the testimony.

18    THE COURT: Overruled.  You can answer that.

19    THE WITNESS: Uh, I don't know.

20    MR. GREENSPAN: As a matter of fact, you never told anybody that he was throwing up blood until today, right?

21

22    A. Yes.

23    (Lodgment No. 2, vol. 2 at 385-86.)

24    The record also definitively establishes the prosecutor learned the information about Estrella

25    witnessing Angel's death when the court–appointed advocate testified to it during Ballard's sentencing

26    hearing.  After hearing the advocate state that "[t]hrough therapy, they [have] now learned that the 4-

27    year-old little girl witnessed the murder and she is having a very difficult time. . . ," the prosecutor told

28    the court that "[in] terms of the information regarding [Estrella], I don't have any information to relay

1  to the court on that [as] I heard the comment as it was being said." (Lodgment No. 2, vol. 11 at 1538,

2  1547-48.)

3      Ballard has also not established that the evidence was exculpatory. *See Strickler*, 527 U.S. at

4  281-82. Evidence that Angel was throwing up blood in the days before his death may have indicated

5  that he was suffering from some medical condition or injury before he died, but it does not in any way

6  help establish that Ballard did not inflict the injuries on Angel that led to his death. Nor does the fact

7  that Estrella may have witnessed Angel's death, since there is no evidence that she would have named

8  anyone other than Ballard as the person who killed Angel.

9      Finally, Ballard has not established that the evidence Ballard alleges was suppressed was material

10 or that he was prejudiced by its suppression. *Strickler*, 527 U.S. at 281-82. Extensive, persuasive

11 evidence was presented at trial indicating that Angel was the victim of a violent physical attack that

12 caused his death while he was in Ballard's care and that Ballard's explanation of how Angel was injured

13 was inconsistent with his injuries. (Lodgment No. 2, vol. 2 at 448-77, vol 4 at 587-659 [testimony of

14 Dr. Sandy Murray]; vol. 3 at 549-53 [testimony of Deputy Bustamante]; 553-83 [testimony of Deputy

15 Nares]; vol 6 at 947-64 [testimony of Deputy Sobecki]; vol 7 at 1073-1177 [testimony of Dr. Christina

16 Stanley].) In addition, Cesar Solar, Angel's brother, testified that after being sent to his room by Ballard

17 for answering the phone, he heard Angel crying, the sound of hitting and Ballard's voice. (Lodgment

18 No. 2, vol. 7 at 1035-39, 1067.) And, Detective Nares testified that Jose de Leon told him that Ballard

19 admitted hitting Angel on the night of the incident but he did not know how hard. (Lodgment No. 2, vol.

20 7 at 1192.) Analyzing the allegedly suppressed evidence together, as the Court is required to do under

21 *Benn*, the Court concludes the evidence is not "material" because it does not "undermine[] confidence

22 in the outcome of the trial." *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S.

23 at 111-12).

24      For all the foregoing reasons, Ballard is not entitled to relief as to this claim.

25      4.     *Shackling (Claim Three)*

26      In claim three, Ballard argues his federal due process rights to a fair trial were violated when

27 jurors saw him shackled during the trial. (Pet. at 8; Mem. P .& A. Supp. Pet at 16-20.) Respondent

28 counters that the claim is procedurally defaulted. In the alternative, Respondent argues that the state

09cv0957

courts resolution of this claim was neither contrary to, nor an unreasonable application of clearly established Supreme Court law.  (Answer at 6; Mem. P. & A. Supp. Answer at 12-15.)

Ballard raised this claim in the petition for review he filed in California Supreme Court. (Lodgment No. 7.)  Because that court denied the petition for review without citation of authority, this Court must "look through" to the state appellate court's opinion as the basis for its analysis.  *Ylst*, 501 U.S. at 801-06.  The appellate court declined to address the shackling claim on the merits because it determined that "any right to challenge the use of the ankle restraint was forfeited by defense counsel's failure at trial to object . . . ."  *People v. Ballard*, 2007 WL 1600386, slip op.(Cal. Ct. App. 2007) at *2. Although Respondent asserts the claim is procedurally defaulted, he has not asserted that the procedural bar that was imposed is independent and adequate and therefore has not met his initial burden under *Bennett*.  *See Bennett*, 322 F.3d at 586.  Because the state court did not address the merits of this claim due to a procedural bar, and Respondent has not, the Court must conduct a de novo review of the claim. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).

"A criminal defendant has a constitutional right to be free of shackles and handcuffs in the presence of the jury absent an essential state interest that justifies the physical restraints." *Williams v. Woodford*, 384 F.3d 567, 591 (9th Cir. 2004) (citing *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir.2002) and *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir.1999).  A shackling claim brought on federal habeas review, however, is subject to harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) which requires the Court to determine whether the shackling had a substantial and injurious effect on the verdict.  *Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir.1995); *Castillo v. Stainer*, 983 F.2d 145, 148 (9th Cir.1992), *amended by* 997 F.2d 669 (9th Cir.1993).

Ballard has not established he suffered any prejudice.  In the first instance, there is no evidence in the record that the jury ever saw Ballard in shackles.  In fact, the only evidence in the record with regard to Ballard's shackles is a conversation between defense counsel, the prosecutor and the trial judge regarding whether to give a jury instruction directing the jury to disregard the shackles.   The conversation establishes that no one thought the jury could see the shackles:

> THE COURT: Okay, 204 [the shackling instruction].  Do you want that given? I don't think it's even that obvious at all.
>
> MR. GREENSPAN: I don't think it's obvious at all.

09cv0957

1    THE COURT: I don't either.

2    MR. GREENSPAN: I wouldn't be asking for it.

3    THE COURT: Okay.  Yeah, we've got a skirt all the way around.  204, for the record, is defendant's restraints.  And he has — his hands have not been restrained, it's only been by the ankle underneath the table with a skirt.   I don't think it's visible to anybody.

4

5    MR. GREENSPAN: Right.

6    THE COURT: So — and Mr. Greenspan doesn't want to emphasize that fact, so we're not going to give it.

7

8    (Lodgment No. 2, vol. 5 at 830-31.)

9    There is simply no evidence that the outcome of Ballard's trial was affected in any way by his

10   shackling.  Accordingly, the state court's resolution of this claim was neither contrary to, nor an

11   unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.SA. at 412-13.

12   Brown is not entitled to relief as to this claim.

13   **V.       CONCLUSION AND RECOMMENDATION**

14   The Court submits this Report and Recommendation to Chief United States District Judge Irma

15   E Gonzalez under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court

16   for the Southern District of California. For the reasons outlined above, **IT IS HEREBY**

17   **RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and

18   Recommendation, and (2) directing that Judgment be entered denying the Petition and denying the

19   request for an evidentiary hearing.

20   **IT IS ORDERED** that no later than **February 4, 2010,** any party to this action may file written

21   objections with the Court and serve a copy on all parties.  The document should be captioned

22   "Objections to Report and Recommendation."

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

09cv0957

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

2  served on all parties no later than **February 18, 2010**.  The parties are advised that failure to file

3  objections within the specified time may waive the right to raise those objections on appeal of the

4  Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d

5  1153, 1156 (9th Cir. 1991).

6
   DATED:  January 5, 2010
7

8  _____

9  **CATHY ANN BENCIVENGO**
   United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09cv0957